# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CALDWELL MANUFACTURING COMPANY NORTH AMERICA, LLC<br><br>Plaintiff,<br><br>v.<br><br>AMESBURY GROUP, INC.,<br><br>Defendant. | Civil Action No. 11-CV-6183-T<br><br>OPPOSITION TO MOTION |

# AMESBURY'S OPPOSITION TO
# CALDWELL'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION..........................................................................................................1

FACTUAL BACKGROUND .....................................................................................2

ARGUMENT ..............................................................................................................5

I.     CALDWELL HAS FAILED TO PROVE IRREPARABLE HARM ...........5

    A.     Caldwell Is Not Entitled to a Presumption of Irreparable Harm .............6

    B.     Caldwell's Delay Prevents a Finding of Irreparable Harm......................6

    C.     Caldwell Has Provided No Evidence of Irreparable Harm.......................7

    D.     The Speculative Harms Caldwell Alleges Are Not Irreparable..............9

II.    CALDWELL IS NOT LIKELY TO SUCCEED ON THE MERITS .........12

    A.     The Asserted Claims Are Invalid...........................................................12

    B.     Amesbury Does Not Infringe the Asserted Claims................................14

III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
      DISFAVOR GRANTING A PRELIMINARY INJUNCTION. ...................23

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abbott Labs. v. Andrx Pharm., Inc.*,
   452 F.3d 1331 (Fed. Cir. 2006)........................................................................................6

*Abbott Labs. v. Sandoz, Inc.*,
   500 F. Supp. 2d 807 (N.D. Ill. 2007) ...........................................................................10

*Abbott Labs. v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008).....................................................................................10

*Abbott Labs. v. Selfcare, Inc.*,
   17 F. Supp. 2d 43 (D. Mass. 1998) ...........................................................................7, 24

*Amazon.com, Inc. v. barnesandnoble.com, inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)...........................................................................5, 12, 14

*Atlanta Attachment Co. v. Leggett & Platt*,
   1:05-CV-1071-ODE, 2007 U.S. Dist. LEXIS 96872 (N.D. Ga. Feb. 23, 2007) ....................24

*Automated Merch. Sys., Inc. v. Crane Co.*,
   357 F. App'x 297 (Fed. Cir. 2009) ..................................................................... passim

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
   692 F. Supp. 2d 805 (N.D. Ohio 2010)...........................................................................9

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
   80 F.3d 1553 (Fed. Cir. 1996).......................................................................................10

*Cummins-Allison Corp. v. Glory Ltd.*,
   No. 02 C 7008, 2003 WL 355470 (N.D. Ill. Feb. 12, 2003)....................................................11

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)........................................................................................ passim

*Eli Lilly & Co. v. Am. Cyanamid Co.*,
   82 F.3d 1568 (Fed. Cir. 1996).........................................................................................9

*Emory Univ. v. Nova Biogenetics*,
   1:06-CV-0141-TWT, 2008 U.S. Dist. LEXIS 57642 (N.D. Ga. July 24, 2008) ..............23, 24

*FieldTurf USA, Inc. v. Astroturf, LLC*,
   725 F. Supp. 2d 609 (E.D. Mich. 2010)......................................................................9, 24

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
 No. C 03-1431 SBA, 2008 U.S. Dist. LEXIS 79689 (N.D. Cal. March 21, 2008) ...............24

*Gayle Martz, Inc. v. Sherpa Pet Group, LLC*,
 08 Civ. 9186 (HB), 2009 U.S. Dist. LEXIS 80929 (S.D.N.Y. Sept. 2, 2009)........................24

*Genentech, Inc. v. Novo Nordisk A/S*,
 108 F.3d 1361 (Fed. Cir. 1997).....................................................................................12

*Helifix Ltd. v. Blok-Lok, Ltd.*,
 208 F.3d 1339 (Fed. Cir. 2000)......................................................................................12

*High Tech Med. Instrumentation v. New Image Indus.*,
 49 F.3d 1551 (Fed. Cir. 1995)..........................................................................................7

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
 906 F.2d 679 (Fed. Cir. 1990)................................................................................9, 10, 24

*Intel Corp v. ULSI Sys. Tech., Inc.*,
 995 F.2d 1566 (Fed. Cir. 1993).....................................................................................1, 5

*Kalipharma, Inc. v. Bristol-Myers Co.*,
 707 F. Supp. 741 (S.D.N.Y. 1989)....................................................................................7

*Markman v. Westview Instruments, Inc.*,
 52 F.3d 967 (Fed. Cir. 1995) *aff'd*, 517 U.S. 370 (1996) .......................................................14

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
 683 F. Supp. 2d 740 (N.D. Ill. 2010) ..............................................................................7, 9

*Mike's Train House, Inc. v. Broadway Ltd. Imps.*,
 708 F. Supp. 2d 527 (D. Md. 2010) ...................................................................................8

*MMJK, INC. v. Ultimate Blackjack Tour LLC*,
 513 F. Supp. 2d 1150 (N.D. Cal. 2007) ............................................................................11

*Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.*,
 Civil Action No. 05-CV-1887 (DMC), 2007 WL 2669338 (D.N.J. Sep. 6, 2007)...................9

*Nutrition 21 v. United States*,
 930 F.2d 867 (Fed. Cir. 1991)................................................................................... passim

*Ormco Corp. v. Align Tech., Inc.*,
 463 F.3d 1299 (Fed. Cir. 2006).......................................................................................14

*Pass & Seymour, Inc. v. Hubbell Inc.*,
 532 F. Supp. 2d 418 (N.D.N.Y. 2007) ..............................................................................25

iii

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc).................................................14, 15, 19

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
  472 F.3d 1338 (Fed. Cir. 2006)......................................................................23

*Polymer Tech., Inc. v. Bridwell*,
  103 F.3d 970 (Fed. Cir. 1996).......................................................................10

*Precision Automation, Inc. v. Technical Servs.*,
  No. 07-CV-707-AS, 2007 WL 4480739 (D. Or. Dec. 14, 2007)................................9

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
  237 F.3d 1359 (Fed. Cir. 2001).....................................................................10

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
  98 F. Supp. 2d 362 (S.D.N.Y. 2000)...........................................................23, 24

*Reebok Int'l Ltd. v. J. Baker, Inc.*,
  32 F.3d 1552 (Fed. Cir. 1994)................................................................5, 10, 23

*Rexnord, Inc. v. Laitram Corp.*,
  628 F. Supp. 467 (E.D. Wis. 1986)...................................................................6

*Sanofi-Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006).....................................................................10

*Sensormatic Elecs. Corp. v. Tag Co.*,
  632 F. Supp. 2d 1147 (S.D. Fla. 2008) ...........................................................24

*Smith & Nephew, Inc. v. Synthes (U.S.A.)*,
  466 F. Supp. 2d 978 (W.D. Tenn. 2006)..........................................................24

*Tech-Wear, Inc. v. Acme Laundry Prods., Inc.*,
  38 F. Supp. 2d 1147 (C.D. Cal. 1998) ..............................................................8

*Tennant Co. v. Hako Minuteman, Inc.*,
  651 F. Supp. 945 (N.D. Ill. 1986) ...................................................................7

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
  308 F.3d 1193 (Fed. Cir. 2002)......................................................................15

*TIP Sys. LLC v. Phillips & Brooks/Gladwin, Inc.*,
  529 F.3d 1364 (Fed. Cir. 2008)......................................................................23

*Titan Tire Corp. v. Case New Holland, Inc.*,
  566 F.3d 1372 (Fed. Cir. 2009).......................................................................5

iv

*TruePosition Inc. v. Andrew Corp.*,
  568 F. Supp. 2d 500 (D. Del. 2008) .......................................................................24

*Visto Corp. v. Seven Networks, Inc.*,
  2:03-CV-333-TJW, 2006 U.S. Dist. LEXIS 91453 (E.D. Tex. Dec. 19, 2006) ......................24

*Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999) ............................................................................15

*Voilé Mfg. Corp. v. Dandurand*,
  551 F. Supp. 2d 1301 (D. Utah 2008) ....................................................................7

## STATUTES

35 U.S.C. § 102 ...........................................................................12, 13, 14

35 U.S.C. § 103 ....................................................................................13

## OTHER AUTHORITIES

37 C.F.R. § 1.510. ................................................................................13, 14

1 Donald S. Chisum, *Chisum on Patents* § 3.05[2][a] (2011) ...........................................14

LIBA/2199676.5

## INTRODUCTION

The Court should deny Caldwell Manufacturing Company North America, LLC's request for a preliminary injunction because Caldwell has failed to meet its burden to prove that (1) it has a substantial likelihood of prevailing on the merits of its infringement claim against Amesbury Group, Inc. and (2) absent a preliminary injunction it will suffer irreparable harm.  To the contrary, Caldwell has failed to address important evidence (that is well known to Caldwell) raising substantial questions whether its patents are valid, and it has violated basic principles of patent claim construction to support its infringement argument (which fails otherwise).  The seven months Caldwell delayed before filing suit, alone, belies Caldwell's claim of irreparable harm and undercuts Caldwell's claim for preliminary relief.

A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."  *Intel Corp v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  For example, of the twenty-seven "injunction" cases cited in Caldwell's brief, thirteen are actually <u>permanent</u> injunction cases, and of those that grant or uphold a preliminary injunction, only four issued after *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006) (in which the Supreme Court held that patent owners seeking injunctions are not entitled to any presumption of irreparable harm—they must prove it).  Thus, preliminary injunctions are hardly "common in patent cases," as Caldwell claims.

Caldwell has fallen far short of proving that it is entitled to a preliminary injunction here.  Caldwell waited seven months after seeing Amesbury promote the accused window balances at a trade show before filing its patent infringement complaint.  It waited six more weeks before serving Amesbury with the complaint, and then another month before filing its preliminary injunction motion.  Urgency is the hallmark of any legitimate claim for preliminary relief, and Caldwell's conduct plainly has lacked any urgency here.

1

And despite having taken seven months to collect evidence to try to support its claim of irreparable harm, all Caldwell has been able to muster is the *threat* of lost sales.  Lost sales, however, are compensable with money damages (if found to result from infringing competition) and cannot alone support a preliminary injunction.  Caldwell's rhetoric that "Amesbury's conduct has caused and threatens to cause erosion of Caldwell's market share and goodwill" and that it "threatens to cause price erosion" is unsupported by any evidence.

Caldwell similarly has failed to show that it is likely to succeed on the merits of its claim, and understandably so, because it is not.  The United States Patent and Trademark Office never considered important evidence (sworn, third party declarations including notarized engineering drawings) establishing that Caldwell's patents are invalid because, as Caldwell interprets its patents, they claim prior art curl spring window balances.  Caldwell, is aware of this evidence, but has ignored it entirely in its moving papers.  Thus, Caldwell has failed to meet its burden to show that its patents are likely valid.  Moreover, Caldwell has relied upon long-discredited claim construction techniques to inflate the scope of its claims, which when properly construed do not cover the accused Amesbury window balances.

Absent a showing of likelihood of success on the merits and irreparable harm, public policy weighs against a preliminary injunction, as does the balance of the hardships.  Thus, the Court should deny Caldwell's motion.

## **FACTUAL BACKGROUND**

Amesbury and Caldwell both manufacture and sell a wide range of hardware products for use in windows, sometimes called fenestration hardware.  (Doc. No. 1, Compl. ¶ 9.)  Caldwell filed the present suit accusing three Amesbury window balances of infringing U.S. Patent Nos.

2

5,353,548 (Ex. 1) and 5,463,793 (Ex. 2).[1] (Compl. ¶ 11–34.)   In fact, this is the third patent litigation between the companies, Amesbury having filed the first two to prevent the further infringement by Caldwell of Amesbury patents concerning block and tackle window balances and constant force curl spring window balances similar to the ones at issue here.

The patents-in-suit concern curl spring balances for double hung windows, such as are found in many residential and commercial buildings.   Double hung windows include a window frame and two window sashes encasing panes of glass. (*See* '548 patent figs. 1–3.)   The vertical sides of the window frame, called jambs or shoe channels, define tracks in which the window sashes slide up and down.   ('548 patent col.3, ll.3–6.)   Hung windows utilize a pair of window balances to offset the weight of each window sash, to allow even heavy sashes to move easily and to maintain their position when opened.   ('548 patent col.1, ll.7–10.)   In some windows, the balances are designed to permit the sashes to tilt inward (i.e., into the building) to facilitate cleaning.

Window balances have been well known for over a century, and window balances that use curl springs to provide tension were well known in the prior art long before Caldwell filed the applications for the patents at issue here.   ('548 patent col.1, ll.5–30.)   The patents-in-suit purport to describe an improved curl spring window balance for use with tilt windows.

Caldwell acknowledges having learned of the accused Amesbury balances in September 2010, at a trade show in Las Vegas where Amesbury displayed the balances at its booth.   (Doc. No. 9, Kessler Decl. ¶¶ 10–11.)   Caldwell has not explained why it delayed nearly seven months before filing its complaint, or an additional month and half before serving it. (Compl.)   Nor has

---

[1] The two Caldwell patents-in-suit share a common specification.

Caldwell explained why it waited another month to move for a preliminary injunction.  (Doc. No. 7, Notice of Mot., June 22, 2011.)

Nevertheless, Caldwell has asked the Court to order a preliminary injunction prohibiting Amesbury from selling the accused window balances during the pendency of the litigation. (Notice of Mot.; Br.[2] 1, 25.)  Caldwell claims, as it must, that without a preliminary injunction it will suffer irreparable harm, based on speculation that Amesbury's sale of the accused window balances threatens to diminish Caldwell's market share, harm its goodwill, and cause price erosion.   (Br. 22.)   Caldwell's factual support for these claims, however, comes from a declaration from its Vice President of Sales and Marketing, John Kessler, who states merely that:

(1)  Caldwell and Amesbury compete in the fenestration hardware industry (Kessler Decl. ¶ 2);

(2)  Caldwell and Amesbury have "an estimated 80 percent market share in the market for window and door hardware" (Kessler Decl. ¶ 2); and

(3)  Amesbury is promoting the disputed window balances (Kessler Decl. at ¶¶ 10–17).

Kessler's Declaration describes that two of Caldwell's independent sales representatives, whom he does not name, heard from two Caldwell customers, whom he also does not name, that Amesbury showed those customers the accused Amesbury window balances.  (Kessler Decl. ¶¶ 14–16.)  Kessler explains that "[i]f those customers purchase infringing Amesbury products," it would impair Caldwell's market share. (Kessler Decl. ¶ 18.)   Kessler does not offer any information concerning the prices that Caldwell charges for the patented balances or that Amesbury charges for the accused balances.   Caldwell has not offered any information concerning the relative market shares of Amesbury and Caldwell in the market for "window and

---

[2] "Br." refers to Doc. No. 7-7 ("Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction").

door hardware" generally, or for the accused products in particular, and it likewise has offered no economic data or opinion testimony to explain the impact that Amesbury's promotion of the disputed balances is likely to have on the relevant market.

## ARGUMENT

A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc*., 995 F.2d 1566, 1568 (Fed. Cir. 1993). For a preliminary injunction to issue here, Caldwell must show: (i) likelihood of success on the merits, (ii) likelihood of irreparable harm in the absence of a preliminary injunction, (iii) a balance of the hardships in favor of Caldwell, and (iv) that the preliminary injunction favors the public interest. *See Titan Tire Corp. v. Case New Holland, Inc*., 566 F.3d 1372, 1375–76 (Fed. Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 129 S. Ct. 365, 374 (2008)). Given the "extraordinary" character of preliminary injunctive relief, Caldwell must make a "clear" showing of likely success on the merits and irreparable harm. *See Nutrition 21 v. United States*, 930 F.2d 867, 869–70 (Fed. Cir. 1991).

## I.   CALDWELL HAS FAILED TO PROVE IRREPARABLE HARM

"[A] movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. barnesandnoble.com, inc*., 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original); *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("[A] movant must establish both a likelihood of success on the merits *and* irreparable harm . . . ."). The Court's decision whether to grant Caldwell's motion "must be exercised consistent with traditional principles of equity," which require that Caldwell, as the movant, prove irreparable harm. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

5

### A.      Caldwell Is Not Entitled to a Presumption of Irreparable Harm

Caldwell's acknowledgement that the historical presumption of irreparable harm, which only arose upon a clear or strong showing of infringement, "has been eroded to a certain extent" dramatically understates the point. (Br. 20.)  Rather, the Supreme Court has rejected the notion that a court should presume irreparable harm even after infringement has been proven on a full consideration of the merits.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006).[3] Following this mandate, the Federal Circuit reversed a district court that had applied the presumption in deciding to order a preliminary injunction.  *Automated Merch. Sys., Inc. v. Crane Co.*,  357 F. App'x 297, 301 (Fed. Cir. 2009) ("The burden is now on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages.").  Thus, it is Caldwell's burden here to prove that in the absence of a preliminary injunction it will suffer irreparable harm.

### B.      Caldwell's Delay Prevents a Finding of Irreparable Harm

A plaintiff who truly feared irreparable harm "would have hurried to the Court to save their interests." *Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467, 474 (E.D. Wis. 1986).  Here, Caldwell learned of the accused Amesbury window balances at a trade show on September 14– 16, 2010, (Kessler Decl. ¶ 10) but waited approximately seven months before filing its complaint. (Compl., Apr. 11, 2011.)  Caldwell then delayed an additional month and a half before serving its complaint, (Doc. No. 4, Aff. of Service, May 24, 2011), and approximately a month after that before moving for a preliminary injunction.  (Notice of Mot., June 22, 2011.) The slow pace with which Caldwell has sought relief undercuts its claim of irreparable harm.

---

[3] While the facts of the *eBay* case involved a permanent injunction, the decision applies equally to both permanent and preliminary injunctions. *See, e.g., Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1334 (Fed. Cir. 2006) (citing *eBay* in discussing a motion for preliminary injunction).

6

*See Nutrition 21*, 930 F.2d at 872 (reversing *Nutrition 21 v. Thorne Research, Inc.*, No. C90-62D, 1990 WL 300282, at *1 (W.D. Wash. Mar. 14, 1990)) (seven-month delay in bringing suit sufficient to negate a finding of irreparable harm); *see also High Tech Med. Instrumentation v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (citing *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F. Supp. 278, 280 (S.D.N.Y. 1971)) ("need for immediate relief is undercut by the slow pace with which plaintiff has sought to obtain it"); *Abbott Labs. v. Selfcare, Inc.*, 17 F. Supp. 2d 43, 50 (D. Mass. 1998) (delay of nine months weighs against irreparable harm finding); *Kalipharma, Inc. v. Bristol-Myers Co.*, 707 F. Supp. 741, 756 (S.D.N.Y. 1989) (delay of seven months negates irreparable harm finding); *Tennant Co. v. Hako Minuteman, Inc.*, 651 F. Supp. 945, 961–62 (N.D. Ill. 1986) (delay of spring to December, approximately six to nine months, negates irreparable harm).

### C.     Caldwell Has Provided No Evidence of Irreparable Harm

Caldwell's claims that it will lose profits, market share, and goodwill if Amesbury is not enjoined lack any evidentiary support and are therefore insufficient to justify preliminary injunctive relief. *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 748–49 (N.D. Ill. 2010) (finding "conclusory affidavits based on speculation . . . insufficient to justify injunctive relief prior to a trial on the merits"); *Voilé Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) ("Courts require more than unsupported factual conclusions to support such a finding [of likely irreparable harm].").

"[L]ost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction." *Automated Merch. Sys., Inc.*, 357 F. App'x at 301. Where there is "no evidence before the court regarding the sales of" either party's product, it is "impossible to determine whether or to what extent [the movant's] market share has been eroded." *Voilé Mfg. Corp.*, 551 F. Supp. 2d at 1307. "Mere speculation about possible

7

market share losses is insufficient evidence of irreparable harm." *Mike's Train House, Inc. v. Broadway Ltd. Imps.*, 708 F. Supp. 2d 527, 532–33 (D. Md. 2010); *Tech-Wear, Inc. v. Acme Laundry Prods., Inc*., 38 F. Supp. 2d 1147, 1152 (C.D. Cal. 1998) (finding no likely irreparable injury where plaintiffs' affidavits "provide[d] no sales figures, specific instances, or other evidentiary facts to support the conclusion that [plaintiffs were] losing market share").

Caldwell speculates that because it competes with Amesbury, any sale of an accused balance necessarily will diminish Caldwell's market share.  (Br. 21.)  Amesbury offers a variety of window balances, however, and customers purchasing accused balances from Amesbury might otherwise have chosen a different, non-accused Amesbury balance.  Moreover, customers unable to buy the accused balances from Amesbury will not necessarily turn to Caldwell for similar balances; they might buy balances from a third party instead.  Caldwell has provided no evidence that it will lose market share should Amesbury continue selling the accused balances during the litigation.

Likewise, a "conclusory statement that price erosion is possible" is insufficient to support a finding of irreparable harm.  *Automated Merch. Sys., Inc*., 357 F. App'x at 301.  Yet, that is all Caldwell has offered: one unsupported statement in its brief that continued sale of Amesbury's balances "threatens to cause price erosion."  (Br. 22.)  Neither of the declarations submitted in support of Caldwell's brief, nor any other evidence, identifies the prices that Amesbury and Caldwell charge for their window balances or even mentions price erosion.  Thus, Caldwell has provided no basis to support a finding that absent a preliminary injunction Caldwell will suffer price erosion.

Caldwell also alleges that "Amesbury's conduct has caused and threatens to cause erosion of Caldwell's . . . goodwill," (Br. 22), but again provides no evidence.  Courts do not

simply assume loss of goodwill.  *See Precision Automation, Inc. v. Technical Servs.*, No. 07-CV-707-AS, 2007 WL 4480739, at *4 (D. Or. Dec. 14, 2007) (finding no irreparable harm absent "any evidence of customer confusion, complaints, or lost sales that would support a finding of lost goodwill"); *Novartis Pharm. Corp. v. Teva Pharm. USA, Inc*., Civil Action No. 05-CV-1887 (DMC), 2007 WL 2669338, at *15 (D.N.J. Sep. 6, 2007) (dismissing patentee's theory that it would lose goodwill by having to compete with lower-priced generic drug as "purely speculative").

### D.   The Speculative Harms Caldwell Alleges Are Not Irreparable

Even if Caldwell had provided evidence to support the harm that it speculates might occur, those harms could be remedied with money damages and therefore are not irreparable.  *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) (no irreparable harm where monetary damages are an adequate); *see also Illinois Tool Works, Inc. v. Grip-Pak, Inc*., 906 F.2d 679, 683 (Fed. Cir. 1990); *Novartis Pharm. Corp.*, 2007 WL 2669338, at *15 ("Any economic harm that Plaintiffs might incur is not irreparable because Defendants can pay damages to satisfy any reasonable judgment awarded to Plaintiffs if Plaintiffs ultimately prevail at trial.").

"[L]oss of sales, profits or market share does not necessarily establish irreparable harm." *McDavid Knee Guard, Inc*., 683 F. Supp. 2d at 748.  "Proof of lost market share and lost sales alone are insufficient to establish irreparable harm . . . ." *FieldTurf USA, Inc. v. Astroturf, LLC*, 725 F. Supp. 2d 609, 617 n.3 (E.D. Mich. 2010).  "Both loss of market share and price erosion are economic harms and are compensable by money damages."  *Novartis Pharm. Corp*., 2007 WL 2669338, at *14; *accord Bettcher Indus., Inc. v. Bunzl USA, Inc*., 692 F. Supp. 2d 805, 821 (N.D. Ohio 2010).

The Federal Circuit has refused to find lost sales sufficient to demonstrate irreparable harm, reasoning, "if they were, irreparable harm would be found in every case involving a 'manufacturer/patentee, regardless of circumstances.'" *Automated Merch. Sys., Inc.*, 357 F. App'x at 300–01 (quoting *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006)); *see also Reebok Int'l Ltd.*, 32 F.3d at 1558; *Illinois Tool Works Inc.*, 906 F.2d at 681 (to assume pretrial sales of infringing products always cause irreparable harm would "disserve the patent system"). "Further, neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." *Nutrition 21*, 930 F.2d at 871 (citation omitted).

While the court did find in *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361–62 (Fed. Cir. 2008), that the district court had not abused its discretion in basing its finding of irreparable harm in part on loss of market share, the lost market share at issue there was exceptional:  Abbott presented evidence, and not just conclusory statements, that it would "face a 90% decline in market share." *Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 843 (N.D. Ill. 2007).  In addition, Abbott showed that it would also "lose[] its preferred position on pharmacy and insurance formularies," a problem unique to the pharmaceutical context. *Id*.  The court in *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006), likewise considered "additional factors," not present here, such as the likely need to reduce the workforce and discontinue clinical trials.

Caldwell also has cited *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1367–68 (Fed. Cir. 2001), *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1565–66 (Fed. Cir. 1996), and *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 974–75 (Fed. Cir.

10

1996), but those pre-*eBay* decisions relied on a presumption of irreparable harm, which as discussed above, no longer exists. *eBay*, 547 U.S. at 393–94; *see also Automated Merch. Sys., Inc.*, 357 F. App'x at 301 (disapproving of district court's reliance on cases that "pre-dated the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, in which the presumption of irreparable harm, based just on proof of infringement, was discarded") (citation omitted).

Caldwell's argument that the parties being direct competitors, particularly in a two-competitor market, establishes irreparable harm also is incorrect.  The Federal Circuit has more than once reversed district court findings of irreparable harm despite the parties being direct competitors.  *See, e.g.*, *Nutrition 21*, 930 F.2d at 868–69; *see also Automated Merch.*, 357 F. App'x at 301 ("[Plaintiff's] machines . . . competed with [defendant]'s allegedly infringing machines.  To the extent that these harms stem from [defendant]'s alleged patent infringement, we cannot conclude that they have been shown to be non-compensable by monetary damages.").  Even in a two-competitor market, competition does not demonstrate irreparable harm; indeed, some courts have found that a two-competitor market cuts against a finding of irreparable harm.  *See, e.g.*, *MMJK, INC. v. Ultimate Blackjack Tour LLC*, 513 F. Supp. 2d 1150, 1157 (N.D. Cal. 2007) ("[T]he presence of only two legal competitors seriously undercuts plaintiff's argument that it will not be able to recapture market share, and strongly suggests that damages will be a sufficient remedy should defendant later be found to infringe."); *cf. Cummins-Allison Corp. v. Glory Ltd.*, No. 02 C 7008, 2003 WL 355470, at *52 (N.D. Ill. Feb. 12, 2003) (no irreparable harm and, because the two parties were the only suppliers of these devices, preliminary injunction would be against public interest).  Caldwell has cited no relevant authority to the contrary.  Instead, every case in Caldwell's brief discussing the impact of the parties being direct

11

competitors deals with the very different context of a <u>permanent</u> injunction, namely, after infringement of a valid patent has been proven.  (Br. 20–21.)

## II.  CALDWELL IS NOT LIKELY TO SUCCEED ON THE MERITS

Caldwell "must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer."  *See Amazon.com, Inc.*, 239 F.3d at 1351.  A preliminary injunction may not issue where the alleged infringer raises a substantial question regarding either infringement or validity.  *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

Evidence that Caldwell's patents claim window balances that were available to the public before the priority date of the patents-in-suit raises a substantial question whether Caldwell's patents are invalid under at least 35 U.S.C. § 102.  Caldwell is well aware of this evidence, but has failed to address it in its briefing.  Moreover, Amesbury's accused products do not infringe any of the four patent claims that Caldwell has identified in its request for a preliminary injunction.

### A.  The Asserted Claims Are Invalid

Although Amesbury has the ultimate burden of proving invalidity at trial, "at the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity."  *Nutrition 21*, 930 F.2d at 869.  A patentee cannot establish a likelihood of success on the merits if the non-movant raises a "substantial question" of invalidity or unenforceability, "*i.e.*, asserts a[] . . . defense that the patentee cannot prove 'lacks substantial merit.'"  *Amazon.com, Inc.*, 239 F.3d at 1350–51.  Resisting a preliminary injunction requires far less proof than would be necessary to avoid liability at trial.  *Id*. at 1358–59; *see also Helifix Ltd. v.*

12

*Blok-Lok, Ltd.*, 208 F.3d 1339, 1351–52 (Fed. Cir. 2000) (affirming denial of injunction where evidence of invalidity was "a very open question" and "very much in equipoise").

In June 1996, Ashland Products, Inc. filed a request for ex-parte reexamination of the two patents-in-suit, pursuant to 37 C.F.R. § 1.510.   (Exs. 3 and 4.)   With its request, Ashland submitted the Declaration of Maurice E. Sterner, Jr. (the "Sterner Declaration") (Ex. 5) and the Declaration of Richard F. Miller (the "Miller Declaration") (Ex. 6), both employees of Product Design and Development ("PD&D").   The Sterner and Miller Declarations together evidence that Maurice Sterner conceived a curl spring window balance and that the balance was known and available to the public prior to the April 1, 1993, priority date of the patents-in-suit. (Sterner Decl. ¶¶ 2, 5; Miller Decl. ¶¶ 2, 4.)   The Sterner Declaration attached a notarized drawing of Mr. Sterner's balance which Mr. Sterner conceived and Mr. Miller disclosed to customers prior to the April 1, 1993, priority date.

Filed herewith is the declaration of Jeffrey Nowell, an expert in the fenestration industry with over thirty-five years of experience and a named inventor on five U.S. patents relating to window and door hardware.   Mr. Nowell analyzed the Sterner Declaration and its attachments and concluded that, using the claim constructions set out in Caldwell's brief, the drawing discloses each and every element of the asserted claims, and therefore anticipates those claims, and/or renders the claims obvious in view of prior art U.S. Patent No. 5,157,808 issued to Maurice Sterner, Jr.   (Nowell Decl. ¶¶ 94–148.) [4]   The claim chart attached as Ex. G to the Nowell Declaration presents Mr. Nowell's analysis. Thus, there is a substantial question whether the asserted claims are invalid as anticipated under at least 35 U.S.C. § 102(a) (or obvious under

---

[4] As discussed below with respect to non-infringement, Amesbury disagrees with many of Caldwell's proposed claim constructions, and under the correct claim constructions, as proposed by Amesbury, the accused Amesbury balances do not infringe any of the asserted claims.

35 U.S.C. § 103), because the claimed inventions were "known or used by others in this country" before Caldwell filed the applications that led to the patents in suit.  35 U.S.C. § 102(a); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305–06 (Fed. Cir. 2006) (finding prior art under § 102(a) where a doctor "promoted his system to other orthodontists" because knowledge or use under § 102(a) at most means the absence of affirmative steps to conceal); 1 Donald S. Chisum, *Chisum on Patents* § 3.05[2][a] (2011) ("[A]t most the publicity requirement in Section 102(a) means the absence of affirmative steps to conceal.").

The United States Patent and Trademark Office did not consider the merits of the Sterner Declaration during its reexamination of the patents in suit, because 37 CFR § 1.510 limits prior art in reexamination proceedings to only "patents or printed publications."  (Ex. 7, '793 patent, Re-Examination File History, Order of September 24, 1996, at 2.)  The Sterner and Miller Declarations concern prior public use and knowledge, however, not prior art patents or printed publications.  Thus, neither the Patent Office during its reexamination or otherwise, nor Caldwell in its moving papers, has confronted the merits of the invalidity defense laid out in the Sterner and Miller Declarations. There is a substantial question, therefore, whether the asserted Caldwell patent claims are valid, which precludes a preliminary injunction. *Amazon.com, Inc.*, 239 F.3d at 1350–51.

### B.    Amesbury Does Not Infringe the Asserted Claims

Caldwell asserts that Amesbury is infringing claim 1 of the '793 patent and claims 41, 42, and 43 of the '548 patent.  To determine infringement, the Court must first construe the meaning and scope of the asserted patent claims, and then compare the claims as construed to the evidence concerning the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) *aff'd*, 517 U.S. 370 (1996).

This Court is no doubt well familiar with the Federal Circuit's claim construction methodology as reaffirmed in *Phillips v. AWH Corp*., 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).  As *Phillips* mandates, while a claim construction analysis begins by considering the language of the claims themselves, "claims 'must be read in the view of the specification, of which they are a part.'"  *Id.* at 1314–15 (quoting *Markman*, 52 F.3d at 979).  Courts may also look to extrinsic evidence such as dictionaries to determine the meaning of claim terms, but extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of the claim language."  *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted).

Caldwell cites *Phillips* in its discussion of patent claim construction law, but then ignores *Phillips* and instead relies on the pre-*Phillips*, *Texas Digital Systems, Inc. v. Telegenix, Inc*., 308 F.3d 1193 (Fed. Cir. 2002) claim construction approach, which construed claim terms by first referring to general dictionary definitions.  (Br. 8–11.)  *Phillips* rejected this approach.  415 F.3d at 1320 ("[T]he methodology [*Texas Digital*] adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history.").  As demonstrated below, Amesbury does not infringe any of the asserted claims, as properly construed.[5]

### 1.    *Claim 1 of the '793 Patent*

Claim 1 of the '793 patent recites:

---

[5] Amesbury offers here its claim construction of only those claim terms that appear to be in dispute. This Court only needs to construe claim terms that are in controversy, to the extent necessary to resolve the controversy.  *See Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Amesbury reserves its right to present claim construction arguments on any such additional claims terms as this case proceeds.

LIBA/2199676.5

> A **sash shoe** configured for running in a shoe channel of a window jamb to transmit counterbalance lifting force to a sash, the **sash shoe** comprising:
>
> a. a **shoe body** retaining a curled length of a curl spring having an uncurled length extending above the body; and
>
> b. a free end region of the uncurled length of the curl spring being connected to a mount that is releasably retained on an upper region of the **shoe body until the mount is fastened to a mounting surface.**

('793 patent claim 1 (emphasis added).)

To show likelihood of infringement, Caldwell must show that the accused Amesbury balances include every limitation of the claim. Jeffrey Nowell, president of Fenestration Consulting International Consulting, LLC, with over thirty-five years of experience in the fenestration industry, examined each of the accused Amesbury balances. He found that each of the accused balances avoids at least three limitations of the claim: (a) "a shoe body retaining a curled length of a curl spring"; (b) "a mount that is releasably retained on an upper region of the shoe body"; and (c) "a mount that is releasably retained . . . until the mount is fastened to a mounting surface." (Nowell Decl. ¶¶ 40-66.) Thus, the accused Amesbury balances do not infringe claim 1 of the '793 patent.

### (a)      "A Shoe Body Retaining a Curled Length of a Curl Spring"

The "shoe body," as can be ascertained from the context of the claims, is the body of the recited "sash shoe." Caldwell construes "sash shoe" in an overbroad fashion to cover the entire Amesbury balance (Br. 10), but the '793 specification makes clear that the "sash shoe" is one component of the window balance, not the entire balance. The specification, for example, describes several embodiments of the "sash shoe," including one that includes the curl spring within the body of the shoe (*e.g.*, '793 patent fig. 8), and others where the curl spring is outside the sash shoe (*e.g.*, *id.* at figs. 22 and 23). More specifically, Fig. 22 shows the curl spring 10

16

completely outside and above the sash shoe 80, which is just one component of the balance.  (*Id.* at col.8, ll.8–17.)  Fig. 23 similarly shows an embodiment including curl springs 23 and 13, which are completely outside and above the sash shoe 80.

Furthermore, the '793 patent expressly describes the "sash shoe" as the portion of the window balance that connects the balance to the window sash.  For example, the specification explains that "[r]eceiver 60 . . . participates in a connection between shoe 50 and sash 20."  (*Id.* at col.5, ll.3–4) and that "[t]he sash shoe 80 of FIG. 22 includes a receiver 60 affording a connection with a sash . . ."  (*Id.* at col.8, ll.8–9).  The disclosed "shoe" also is described as functioning to lock the shoe in the shoe channel when the window sash is tilted.  For example, "[w]hen sash 20 tilts, receiver 60 is turned or pivoted within shoe 50, which makes cam 65 ride up one of the inclined surfaces 46 onto face surface 47."  (*Id.* at col.5, ll.17–20)  "This thickens or widens shoe 50 by increasing the separation between its front and back surfaces so that shoe 50 locks into shoe channel 15 when sash 20 tilts."  (*Id.* at col.5, ll.23–25.)

The extrinsic evidence is in accord.  For example, the American Architectural Manufacturers Association ("AAMA") Glossary defines "shoe" as "[a] component of a Type 2 balance which provides an engagement location for the pivot pin or pivot bar" and the "pivot bar or pin" is defined in the same glossary as "components that link the sash to the friction shoe/clutch of the balance."  (Ex. 8, Am. Architectural Mfrs. Ass'n, *AAMA Glossary AG-11* 35, 42, *available at* http://pubstore.aamanet.org/docs/AAMA_Glossary.pdf.)  Even the general purpose dictionary on which Caldwell relies defines shoe as "a device that retards, stops, or controls the motion of an object," referring to the function of the shoe to brake or lock the balance into the shoe channel when the window sash is tilted.  *Webster's New Ninth Collegiate Dictionary* 1088 (1988) [hereinafter *Webster's Ninth*] (Ex. 9).

17

Thus, relying first and primarily on the intrinsic evidence, with the extrinsic evidence in support, the correct construction of "sash shoe" is: "the component of the window balance that connects the balance to the window sash and that locks the window balance within the shoe channel when the window sash is tilted."

Each of the accused Amesbury balances includes a "sash shoe," as shown in Nowell Declaration Exs. C–E, but the accused balances do not include any "[sash] shoe body retaining a curled length of curl spring," as required by claim 1 of the '793 patent.  As shown in Nowell Declaration Exs. C, D, and E, and as described in the Nowell Declaration, the curl spring in the Amesbury balances are completely outside the sash shoe and so are not retained by the "[sash] shoe body."  (Nowell Decl. ¶¶ 43–44, 52–53, 61–62.)  For at least these reasons, Amesbury does not infringe claim 1 of the '793 patent.[6]

Caldwell has argued that the entire Amesbury balance constitutes the claimed "sash shoe," but this cannot be the case, because properly construed the claimed "sash shoe" is not the entire balance, but rather only the portion of the balance that connects the balance to the sash and that locks the balance in the shoe channel.  In previous litigation between the parties, Caldwell's expert, Charles Still, agreed with Amesbury's construction here and identified the "shoe" in a similarly structured balance as solely the bottom portion of the balance connecting the balance to the sash.  (*See* Ex. 10, April 17, 2006, Expert Report of Charles Still in *Amesbury Group, Inc. v. Caldwell Mfg. Co.*, D. Mass., Civil Action No. 05-10020-DPW, 3–4.)  The court should reject Caldwell's and Mr. Still's attempt now improperly to broaden Caldwell's claims to try to show infringement.

---

[6] To the extent that "retaining" can be construed as "carrying," as discussed below with respect to claim 41 of the '548 patent, the Amesbury sash shoes do not carry the curl spring.

**(b)**  **"A Mount That Is Releasably Retained on an Upper Region of the Shoe Body"**

As shown in Exs. C–E of the Nowell Declaration, the spring mounts of the accused Amesbury window balances are attached to the top of the window balances, and not to the "shoe body" or "an upper region of the shoe body."  The shoe body is at the lower end of the balance and is connected to the top of the balance by a plastic connector.  For this additional reason, Amesbury does not infringe claim 1.

**(c)**  **"A Mount That Is Releasably Retained . . . Until the Mount Is Fastened to a Mounting Surface"**

Some claim terms are of such ordinary usage and not specific to the art, that their ordinary meaning to a layperson suffices as a construction.  *Phillips*, 415 F.3d at 1314.  The term "until" here is such a term and its ordinary meaning to a layperson is "up to the time that."  *See Webster's Ninth*, *supra*, at 1295.  Common usage of "until" in this context means up to the time of a certain event, but not after the occurrence of the event.

Thus, this claim element requires that the mount be retained up to the time that it is fastened to the mounting surface.  Jeffrey Nowell studied the structure and function of the Amesbury balances, and attached the accused balances' mounts to a window jamb mounting surface by fastening, and demonstrated that each of the Amesbury mounts <u>remains</u> retained on the Amesbury balance <u>after</u> fastening to the mounting surface.  (Nowell Decl. ¶¶ 46–47, 55–56, 64–65.)  Thus, the Amesbury balances do not include a mount that is "releasably retained . . . until the mount is fastened to the mounting surface."

Notably, Caldwell's Charles Still does not claim ever to have fastened any Amesbury mount to a mounting surface.  (Doc. No. 7-2, Still Decl. ¶¶ 6–7.)  Instead, Mr. Still bases his opinion here on a "physical examination" of the accused Amesbury balance, rather than on a simple test to ascertain whether the mount releases upon fastening to the mounting surface.  *Id.*

### 2.    *Claim 41 of the '548 Patent*

Claim 41 of the '548 patent recites:

> 41. A sash balance system for a tilt sash connected on a tilt axis to a pair of counterbalanced **lock shoes** that move vertically in jamb shoe channels as the sash moves vertically in sash runs, the balance system comprising:
>
> a. curled convolutions of a curl spring **carried** by each of the **shoes** above the tilt axis to **counterbalance the shoes**;
>
> b. the **shoes** having surfaces below the curled convolutions arranged for bearing slidably against walls of the shoe channels; and
>
> c. the shoes being configured above the bearing surfaces to allow uncurled lengths of the curl springs to pass from the curled convolutions into the shoe channels above the bearing surfaces where the uncurled lengths of the curl springs rest against shoe channel walls during sash movement.

(emphasis added).

None of three accused Amesbury balances infringes this claim because each of the three accused Amesbury balances lacks at least the following claim elements: (a) "curled convolutions of a curl spring carried by each of the shoes"; (b) "curled convolutions of a curl spring . . . to counterbalance the shoes;" and (c) "shoes being configured above the bearing surfaces to allow uncurled lengths of the curl springs to pass from the curled convolutions into the shoe channels." (*See* Nowell Decl. ¶¶ 67–92.)

### (a)    "Curled Convolutions of a Curl Spring Carried by Each of the  Shoes"

While the term "shoes" in claim 41 refers to the recited "lock shoes," and not the "sash shoe" recited in claim 1 of the '793 patent,  it appears clear from the specification that the term "lock shoe" and "sash shoe" are used to describe the same structure.  The specification states that "[a] preferred embodiment of lock shoe 50 is illustrated in FIGS. 4–11," but FIGS. 4–11 are described in the "Drawings" section as embodiments of "sash shoes."  ('548 patent col.4, ll.36–

37; col.2, ll.12–30.)  Thus the "lock shoes" and "shoes" of  claim 41 of the '548 patent must be

accorded the same construction as "sash shoe" of claim 1 of the '793 patent, as discussed above.

The term "carried" may be construed by reference to the specification.  For example, the

embodiment described in Fig. 22 "carries the curled up convolutions 13 of curl spring 10." (*Id.* at

col.8, ll.31–32.)  The carrying occurs, because the curl spring 10 is wrapped around a hub 81

which is in turn physically attached to the shoe 80.  As FIG. 22 shows, the shoe 80 bears the

weight of the curl spring and thus can be said to "carry" the curl spring.   This is in accordance

with the dictionary definition of "carry" as "to hold or comport . . . to sustain the weight or

burden of."  *Webster's Ninth*, *supra*, at 210.

As stated in Jeffrey Nowell's declaration, after his examination of the accused Amesbury

balances, he determined that the "shoes" of the Amesbury balances do not carry the curl spring.

When installed in a window jamb, the curl springs in the Amesbury balances are so tightly

wound that their internal tension exerts an upward force on the upper portion of the window

balance, away from the "shoes," pulling the window balance upward.  This is the force that

counters the weight of the window sash.  As a result, the "shoes" in the Amesbury balances do

not bear the weight of the curl spring or hold the spring.  (Nowell Decl.  ¶¶ 70–71, 79–80, 88–

89.)  Thus the shoes of the accused Amesbury balances do not carry the curl spring, and so

cannot infringe claim 41.

### (b)      "Curled Convolutions of a Curl Spring . . . to Counterbalance the Shoes"

The patent specification uses the term "counterbalance" to indicate the function of the

disclosed curl springs to "counterbalance the constant weight of a window sash." ('548 patent

col.1, ll.9–10.)  Thus the term is used in the ordinary meaning of the word, "to oppose or balance

with an equal weight or force."  *See Webster's Ninth*, *supra*, at 297.  However, as the Nowell

Declaration explains, the curl springs in the accused Amesbury balances do not function to

21

counterbalance the shoes.   Rather, they counterbalance the window sash.   Thus, the Amesbury balances do not meet the claim limitation, "curl convolutions of a curl spring . . . to counterbalance the shoes."[7]   Indeed, even Caldwell's expert admits in his declaration that the curl spring in Amesbury's balances serve to counterbalance the sash, and not the shoes.   (*See* Still Decl. ¶¶ 31, 39, and 47.)

      (c)      **"Shoes Being Configured Above the Bearing Surfaces to Allow Uncurled Lengths of the Curl Springs to Pass from Curled Convolutions into the Shoe Channels"**

As shown in Ex. C–E of the Nowell Declaration, because the curl spring of the accused Amesbury balances are completely outside of the shoes, the shoes are not configured in any way to allow the spring to pass into the shoe channels.   This claimed feature is necessary, in embodiments such as those depicted in Figure 4 of the '548 patent, where the curl spring is contained within the shoe 50 and the shoe 50 must be configured with a pair of openings 56, to allow the curl spring to uncurl into the shoe channel.   (*See* '548 patent fig. 4; col.4, ll.50–59.) Amesbury's balance shoes, however, do not contain the curl spring within their bodies and so do not meet this claim limitation.

      *3.*      *Claims 42 and 43 of the '548 Patent*

Asserted claims 42 and 43 of the '548 patent depend on claim 41, and thus each contains the limitations of claim 41.   Amesbury does not infringe claims 42 and 43 for at least the same reasons as discussed above with respect to claim 41.

      *4.*      *Doctrine of Equivalents*

---

[7] While the specification does note that "the springs apply a constant counterbalance lifting force to the shoes, which transmit this lift to the sash," it is the sash that is counterbalanced by the lifting force, not the shoes.   ('548 patent col.1, ll.42–44.)   The shoes simply "transmit" the lifting force exerted by the curl spring to the sash, thereby counterbalancing the weight of the sash.   *Id.*

Caldwell does not argue that the asserted claims are infringed under the doctrine of equivalents, so Amesbury does not address the doctrine of equivalents in detail here. The accused Amesbury balances do not infringe Caldwell's patents under the doctrine of equivalents, however, because any finding to the contrary necessarily would improperly vitiate limitations of the asserted claims, which is improper. *See TIP Sys. LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1379 (Fed. Cir. 2008).[8]

## III. THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST DISFAVOR GRANTING A PRELIMINARY INJUNCTION.

A court may not grant a preliminary injunction without considering the hardship to the nonmovant and the public interest. The Court may disregard these factors if it finds that Caldwell's motion should be denied because it has failed to prove either of likelihood of irreparable harm or likelihood of success on the merits. *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994).

Caldwell argues that the balance of hardships and public interest always favor injunctions against alleged infringers, but as an equitable remedy, deciding whether to grant an injunction requires a district court to weigh the facts specific to the case. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006). The cases Caldwell cites do not hold otherwise. In *Emory University v. Nova Biogenetics*, 1:06-CV-0141-TWT, 2008 U.S. Dist. LEXIS 57642 (N.D. Ga. July 24, 2008)*,* for instance, where the court explained that "it is difficult to conceive how an

---

[8] In *TIP Systems*, the Federal Circuit refused to find that an accused device with an actuating switch that was not connected to the phone line was equivalent to the claimed "actuating switch connected to said phone line." *Id.* The court reasoned that doing so would vitiate the claim requirement that the actuating switch be connected to the phone line. *Id; see Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006) ("This court has refused to apply the doctrine [of equivalents] . . . where the accused device contained the antithesis of the claimed structure.").

injunction disserves the public," it was making a conclusion based on the specific facts of that case, including that the corporate defendant was administratively dissolved. *Id.* at *13–14.   And the court in *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F. Supp. 2d 362 (S.D.N.Y. 2000) concluded that the hardships tipped in the plaintiff's favor based on several factors including a finding of irreparable harm. *Id.* at 399.[9]

Again here, Caldwell relies improperly on cases dealing with permanent injunctions.[10] (*See* Br. 22–25.)   When a patent is found after trial to be valid and infringed, the public may reasonably have a greater interest in enforcing it by injunction, and the defendant's interest in continuing to infringe may reasonably be given less weight. *See Illinois Tool Works Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683–84 (Fed. Cir. 1990).   The calculus is far different, however, on a motion for a preliminary injunction.

Moreover, "[i]t would be as adverse to the public interest for this Court to enjoin a fair competitor as it would be for it to fail to enjoin the sale of an infringing product." *Abbott Labs. v. Selfcare, Inc.*, 17 F. Supp. 2d 43, 51 (D. Mass. 1998).   Where "the patentee does *not* establish

---

[9] The court also noted that (a) as the defendant had not introduced its product, it could not suffer the same loss of market share as the plaintiff; (b) the plaintiff's marketing and development costs for their product exceeded the defendant's by more than a factor of twelve; and (c) the product at issue represented 79% of the plaintiff's sales, but only 5.6% of the defendant's. *Id.*

[10] *See also Visto Corp. v. Seven Networks, Inc.*, 2:03-CV-333-TJW, 2006 U.S. Dist. LEXIS 91453, at *2 (E.D. Tex. Dec. 19, 2006); *Gayle Martz, Inc. v. Sherpa Pet Group*, LLC, 08 Civ. 9186 (HB), 2009 U.S. Dist. LEXIS 80929, at *24 (S.D.N.Y. Sept. 2, 2009); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 U.S. Dist. LEXIS 79689, at *5 (N.D. Cal. March 21, 2008); *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 504 (D. Del. 2008); *Sensormatic Elecs. Corp. v. Tag Co.*, 632 F. Supp. 2d 1147, 1154 (S.D. Fla. 2008); *Emory University v. Nova Biogenetics, Inc.*, 1:06-CV-0141-TWT, 2008 U.S. Dist. LEXIS 57642, *11 (N.D. Ga. July 24, 2008); *Atlanta Attachment Co. v. Leggett & Platt*, 1:05-CV-1071-ODE, 2007 U.S. Dist. LEXIS 96872, at *1 (N.D. Ga. Feb. 23, 2007); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 981 (W.D. Tenn. 2006); *Telequip Corp. v. Change Exch.*, 5:01-CV-1748 (FJS/GJD), 2006 U.S. Dist. LEXIS 61469, at *1 (N.D.N.Y. Aug. 15, 2006).

a likelihood of success on the merits . . . 'the public interest is best served by denying the preliminary injunction.'" *FieldTurf USA, Inc. v. Astroturf, LLC*, 725 F. Supp. 2d 609, 618 (E.D. Michigan 2010) (quoting *Abbot Labs. v. Andrx Pharm., Inc.*, 452 F.3d at 1348). At the preliminary injunction stage, the public has an interest in continued competition. *See Pass & Seymour, Inc. v. Hubbell Inc.*, 532 F. Supp. 2d 418, 434 (N.D.N.Y. 2007).

## CONCLUSION

For at least the above reasons, Amesbury respectfully requests that the Court deny in full Caldwell's motion for a preliminary injunction.[11]

Dated: July 20, 2011

Respectfully submitted,

AMESBURY GROUP, INC.

By its attorneys,

/s/ Sharon M. Porcellio
Sharon M. Porcellio
(sporcellio@wardgreenberg.com)
WARD GREENBERG
HELLER & REIDY LLP
300 State Street
Rochester, New York  14614
Tel.:  (585) 454-0716
Fax:  (585) 231-1943

OF COUNSEL

Douglas J. Kline
(dkline@goodwinprocter.com)
Safraz W. Ishmael
(sishmael@goodwinprocter.com)

---

[11] Of note also is that Caldwell's proposed injunction order is impermissibly broad, as it proposes to enjoin Amesbury from activities relating to "any other sash shoe within the scope of U.S. Patent No. 5,463,793" and "any sash balance system within the scope of U.S. Patent No. 5,353,548." (Plaintiff's Proposed Order ¶¶ 1, 2.) As is well established, injunctions to simply not infringe a patent in the future are overbroad and not permitted. *See Int'l Rectifier v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004).

GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109-2881
Tel: (617) 570-1000
Fax: (617) 523-1231

LIBA/2199676.5